UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | |
| Fenton Sub Parcel D, LLC<br><br>              Debtor. | Case No. BKY 11-44430<br>Chapter 11 Case |
| Bowles Sub Parcel D, LLC<br><br>              Debtor. | Case No. BKY 11-44434<br>Chapter 11 Case |

## DEBTORS' TRIAL MEMORANDUM

### INTRODUCTION

Fenton Sub Parcel D, LLC and Bowles Sub Parcel D, LLC ("Debtors") submit this trial memorandum pursuant to the Court's Order dated August 11, 2011, scheduling a trial on Debtors' Motion for Use of Cash Collateral. All capitalized terms not otherwise defined herein have the meaning ascribed to them in the Debtors' verified Motion for Order Authorizing Use of Cash Collateral on a Final Basis [docket no. 9] (the "Cash Collateral Motion") and the Unsworn Declaration of Steven B. Hoyt [docket no. 21] (the "Hoyt Declaration").

The Cash Collateral Motion was heard by the Court on July 20, 2011. At that hearing, when asked by the Court, the Lender admitted that it did not want Debtors to be forced to stop operating, and that only a few items in the Debtors' budget were in dispute. The Court, through further questioning of Lender's counsel, then determined that the only issue in dispute was whether the Debtors could use cash collateral to pay attorneys' fees as shown in Debtors' budget. Following that hearing, the Court entered an order authorizing Debtors' use of cash collateral except for payment of attorneys' fees. [docket no. 27.] This matter is now set for trial. Because

- 1 -

the Lender's interest is protected by a significant equity cushion, Debtors' Cash Collateral Motion should be granted.

## SUMMARY OF THE EVIDENCE

The Debtors anticipate that the evidence at trial will prove the following facts:

### I. THE FACTS RELATING TO THE LENDER'S INTEREST AND THE DEBTORS' NEED FOR CASH ARE UNDISPUTED.

In 2003, Nomura Credit and Capital, Inc. ("Nomura") made a loan to the Debtors in the original principal amount of $11,604,000. The debt is secured by a first priority mortgage on the six commercial properties comprising the Pool D Properties (the "Properties") pursuant to an Amended and Restated Mortgage and Security Agreement ("Mortgage"). The debt is also secured by an Amended and Restated Assignment of Leases and Rents (the "Assignment of Rents"). In addition, pursuant to a Cash Management Agreement, portions of the Debtors' monthly debt service payments were placed into an escrow account for taxes and insurance, as well as the following separate reserve accounts: tenant improvements and leasing commissions reserve, repair reserve, replacement reserve, and debt service reserve (the reserve accounts, together with the Assignment of Rents and the Properties, constitutes the "Prepetition Collateral"). [Stipulation of Undisputed Facts, ¶ 1.]

In 2004, Nomura endorsed the Note and assigned the Mortgage and the Assignment of Rents to Wells Fargo Bank, N.A., as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2004-LN2. Berkadia Commercial Mortgage LLC was chosen to be the servicer of the debt. In November 2010, Lender began acting as the special servicer. [Stipulation of Undisputed Facts, ¶ 2.] At that time, the loan was not in default. The Debtors requested that the special servicer assume responsibility for the loan because of impending issues regarding a court-ordered sale of

one property.  Debtors were advised by the master servicer that only the special servicer could address such issues.

On March 30, 2007, StoneArch II/WCSE Minneapolis Industrial LLC purchased the equity interests of both of the Debtors.  In connection with that purchase, Steven B. Hoyt agreed to assume the obligations under the Indemnity and Guaranty Agreement dated April 12, 2004 between Nomura and Thomas E. Roberts and Michael J. Roberts.  [Stipulation of Undisputed Facts, ¶ 3.]

The Debtors are in default under the Note and the loan documents for, among other things, allowing at least one junior encumbrance on the Properties, and because Steven B. Hoyt filed a voluntary petition for relief under the Bankruptcy Code.  [Stipulation of Undisputed Facts, ¶ 4.]  On June 29, 2011, the Debtors each filed voluntary petitions for relief under the Bankruptcy Code with the United States Bankruptcy Court for the District of Minnesota.  The outstanding principal balance due on the Note as of the petition date was $10,236,629.73.  [Stipulation of Undisputed Facts, ¶ 5.]

The Debtors have continued in possession of the Properties and are continuing to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have a need for the use of the rents, proceeds, products, offspring and profits of the Prepetition Collateral (the "Cash Collateral") to fund operations of their businesses.  [Stipulation of Undisputed Facts, ¶ 6.]

**II.     THE EVIDENCE WILL SHOW THAT THERE IS SIGNIFICANT EQUITY IN THE POOL D PROPERTIES AND OTHER COLLATERAL.**

There is no dispute that the principal value of the Lender's interest is $10,236,629.73.  The only dispute concerns the value of the Pool D Properties and other collateral.

At trial, Steven B. Hoyt, the Debtors' Chief Manager, will testify that the value of the Pool D Properties ranges from $13,135,656 to $14,700,000. This valuation, which is based on an analysis performed by Mr. Hoyt, uses the stabilized rental income approach for five of the six properties. For the five properties so valued, the range of value results from the use of different capitalization rates. If a higher, more conservative capitalization rate of 9.5% is used, the properties are valued at $13.1 million. If a lower, market-based capitalization rate of 8.5% is used, the properties are worth $14.7 million. (Debtors' Exhibits D & F.) For the sixth property (the "Cahill Building"), the Debtors are required pursuant to a court order from the Hennepin County District Court to sell that property for $3.4 million. (Debtors' Exhibit H.) Hence, that amount is the value used by Mr. Hoyt for that property.

As alternative valuation methodologies, Mr. Hoyt also analyzed the Pool D Properties using the sales comparison and cost approaches to valuation. These approaches value the Pool D Properties at $15.1 million and $14.8 million respectively. (Debtors' Exhibit F.)

The Debtors will show that the Pool D Properties are in good condition, do not have any significant deferred maintenance, are fully insured, and not in danger of depreciation while these cases are pending.

Mr. Hoyt will also testify regarding the value of other collateral available to the Lender. Such collateral can be conservatively valued at $489,888. Consequently, Debtors' valuation of the collateral yields an equity cushion of approximately $3.3 million to $4.9 million, or 33% to 48% of the Lender's interest.

The Debtors will also present evidence regarding the tax assessed value of the Pool D Properties. The counties' valuation of these respective properties for 2011 totals $12,855,900. When this value is combined with a conservative valuation of Debtors' additional collateral, the

value of the collateral is approximately $13.3 million, and the equity cushion is 30% of the Lender's interest.

The Debtors expect that the Lender will present evidence of the value of the Pool D Properties through appraisals purchased from CB Richard Ellis. The CB Richard Ellis valuation combines the income approach, the sales comparison approach and the cost approach. Conveniently for the Lender, this valuation appears to total $10,550,000 – just $300,000 more than the amount of Lender's interest. The Debtors will show that the CB Richard Ellis appraisals contain numerous flaws, including valuing the properties "as is" as opposed to using a stabilized occupancy rate, failing to account for the court-ordered purchase price of the Cahill Building, and the use of varying capitalization rates (ranging from seven to ten percent) for similar industrial properties in the same market.

Lastly, the Lender does not have any evidence regarding the value of Debtors' additional collateral.

## **LEGAL ANALYSIS AND AUTHORITY FOR ISSUES OF LAW**

**I.    LEGAL STANDARD.**

The Bankruptcy Code provides that a debtor-in-possession may use cash collateral only with the secured creditor's consent or if the court, after notice and a hearing, authorizes such use. See 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code provides that the Court must provide the secured creditor with adequate protection of its interest upon request of the creditor. The Eighth Circuit Court of Appeals has reasoned that:

> In any given case, the Bankruptcy Court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risk to the secured creditor's value resulting from the Debtor's request for use of cash collateral, and (3) determine whether the Debtor's adequate protection proposal protects values as nearly as possible against risk to that value consistent with the concept of indubitable equivalence.

In re Martin, 761 F.2d 472, 476-77 (8th Cir. 1985).

An equity cushion alone can constitute adequate protection. See In re Johnson, 90 B.R. 973, 979-80 (Bankr. D. Minn. 1988) (holding that when the value of collateral is well in excess of a secured creditors' claim, the equity cushion alone constitutes adequate protection); In re Kost, 102 B.R. 829, 831 (D. Wyo. 1989) (collecting cases and describing how equity cushions equal to or in excess of 20 percent are generally held to provide adequate protection). A "decline" in an equity cushion caused by the accumulation of post-petition interest does not entitle a creditor to additional adequate protection. 3-361 Collier on Bankruptcy P 361.03[1]; see Orix Credit Alliance v. Delta Resources (In re Delta Resources), 54 F.3d 722, 730 (11th Cir. Ala. 1995) ("an oversecured creditor's interest in property which must be adequately protected encompasses the decline in the value of the collateral only, rather than perpetuating the ratio of the collateral to the debt").

## II. THE EQUITY CUSHION IS SUFFICIENT TO PROVIDE THE LENDER WITH ADEQUATE PROTECTION.

As discussed in Debtors' Memorandum of Law in Support of the Cash Collateral Motion [docket no. 9], the Lender's interest will be protected by the Lender's continuing security interest in all post-petition rents pursuant to section 552 of the Bankruptcy Code, the Debtors' maintenance (including insurance) of the Pool D Properties, and the Lender's equity cushion. The heart of this dispute is whether the value of the Pool D Properties and other collateral is sufficient to create an adequate equity cushion for the Lender.

The evidence will show that the Lender's interest is protected by an equity cushion of approximately 33% - 48%. Such a cushion is well in excess of that required to show adequate protection. An equity cushion equal to or in excess of 20% is generally held to provide adequate protection. In re Kost, 102 B.R. at 831; see In re Mellor, 734 F.2d 1396, 1401 (9th Cir. 1984)

(equity cushion of 20% provided adequate protection).  Even if the equity cushion were to dip below 20%, legal authority supports finding the Lender's interest adequately protected.  In re Carson, 34 B.R. 502, 506-07 (D. Kan. 1983) (equity cushion of 11% provided adequate protection); In re Hawaiian Pacific Indus., 17 B.R. 670, 673 (Bankr. D. Haw. 1982) (equity cushion of 15% provided adequate protection); In re Rogers Dev. Corp., 2 B.R. 679, 684 (Bankr. E.D. Va. 1980) (equity cushion of 17-18% provided adequate protection).  Even the Lender's valuation, when totaled using the stabilized income approach and adjusted to account for a court-ordered purchase price of one of the Pool D Properties, yields an equity cushion of 23% without consideration of the additional collateral.

While Lender may attempt to argue that its equity cushion is eroding, the evidence will show that the properties are in good condition, well maintained, and are not depreciating. Moreover, even if post-petition interest is accruing, this does not erode the equity cushion for purposes of this court's analysis.  See 3-361 Collier on Bankruptcy P 361.03[1]; see In re Delta Resources, 54 F.3d at 730.  In light of this evidence, the Lender's interest is well-protected and the Debtors' Motion should be granted.

## CONCLUSION

Based on the evidence presented at trial, Debtors ask the Court to grant their Cash Collateral Motion in its entirety.

| | |
|---|---|
| Dated:  September 12, 2011 |   /e/ Sarah C.S. McLaren<br>James L. Baillie (#3980)<br>Cynthia A. Moyer (#211229)<br>Sarah C.S. McLaren (#345878)<br>FREDRIKSON & BYRON, P.A.<br>200 South Sixth Street, Suite 4000<br>Minneapolis MN 55402<br>(612) 492-7000<br>(612) 492-7077  fax<br>jbaillie@fredlaw.com<br>cmoyer@fredlaw.com<br>smclaren@fredlaw.com<br><br>ATTORNEYS FOR DEBTORS |

4987665_1.DOC