UNITED STATES BANKRUPTCY COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| In re<br><br>Fenton Sub Parcel D, LLC,<br><br>                   Debtor. | Case No. BKY 11-44430<br>Chapter 11 Case |
| In re Bowles Sub Parcel D, LLC,<br><br>                   Debtor. | Case No. BKY 11-44434<br>Chapter 11 Case |

**TRIAL MEMORANDUM AND CHRONOLOGY OF FACTS AND STATEMENT OF LAW OF WELLS FARGO BANK N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF J.P. MORGAN CHASE COMMERCIAL MORTGAGE SECURITIES CORP., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2004-LN2, BY AND THROUGH CWCAPITAL ASSET MANAGEMENT LLC, AS SPECIAL SERVICER**

Wells Fargo Bank N.A., as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2004-LN2, by and through CWCapital Asset Management LLC, as Special Servicer (the "Lender"), files this trial memorandum in support of its objection to the motion for order authorizing use of cash collateral on a final basis (the "Motion") filed by Fenton Sub Parcel D, LLC and Bowles Sub Parcel D, LLC (collectively, the "Debtors").

**INTRODUCTION**

A secured creditor's cash collateral may only be used by a debtor if the secured creditor has consented or the secured creditor's interest is adequately protected. The Debtors

1

have not shown, and cannot show, that the Lender's interest in the cash collateral is adequately protected nor has the Lender consented to the use of the cash collateral.

At a brief hearing on July 20, 2011, this Court permitted the temporary use of cash collateral for certain expenses relating to the upkeep of the properties. The Court excluded the use of the cash collateral to pay attorneys' fees. The hearing on July 20th was not an evidentiary hearing and the Court made no findings. Accordingly, the issue before this Court is whether the Lender's interest in cash collateral is adequately protected so that the Debtors may use the Lender's cash collateral *for any purpose* without the Lender's consent.

The Lender's interest is not adequately protected. The Debtors' proposed adequate protection is the claim of an equity cushion. The Debtors' evidence of an equity cushion is based on imaginary facts – such as the Properties being fully occupied – which they are not. On top of a failed valuation. The Debtors' cash flow requires negative amortization of taxes and the lien of the Lender. The Debtors simply cannot meet their burden to shift the entire risk of these cases to the Lender. The burden is high, and the facts to not meet it. The Motion should be denied.

## CHRONOLOGY OF FACTS

The history of the credit relationship is not in dispute. On or about April 12, 2003, Nomura Credit and Capital, Inc. ("Nomura") made a loan to the Debtors in the amount of $11,604,000. The loan is evidenced by an Amended and Restated Promissory Note dated April 12, 2004 (the "Note"). The debt is secured by a first priority mortgage on the six commercial properties comprising the Pool D Properties (the "Properties") pursuant to an Amended and Restated Mortgage and Security Agreement dated April 9, 2004 but effective April 12, 2004 ("Mortgage"). The debt is also secured by an Amended and Restated Assignment of Leases and Rents dated April 9, 2004 but effective April 12, 2004 (the

2

"Assignment of Rents").  In addition, pursuant to a Cash Management Agreement dated April 12, 2004, portions of the Debtors' monthly debt service payments were placed into an escrow account for taxes and insurance, as well as the following separate reserve accounts: tenant improvements and leasing commissions reserve, repair reserve, replacement reserve, and debt service reserve.

On April 12, 2004, Nomura endorsed the Note and assigned the Mortgage and the Assignment of Rents to Wells Fargo Bank, N.A., as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2004-LN2.  Berkadia Commercial Mortgage LLC was chosen to be the servicer of the debt.

On March 30, 2007, StoneArch II/WCSE Minneapolis Industrial LLC purchased the equity interests of both of the Debtors.  In connection with that purchase, Steven B. Hoyt agreed to assume the obligations under the Indemnity and Guaranty Agreement dated April 12, 2004 between Nomura and Thomas E. Roberts and Michael J. Roberts.

Prior to filing for bankruptcy protection, the Debtors defaulted on their obligations under the Note and the loan documents by, among other things, diverting rents, failing to make required monthly payments required by the Note, and allowing at least one junior encumbrance on the Properties.  An additional event of default occurred under the Mortgage as a result of the bankruptcy filing by Steven B. Hoyt on May 31, 2011.  As a result of these defaults, on June 22 and 28, 2011, all amounts in the reserve accounts were applied by the Lender pursuant to the terms of the loan documents.

On June 29, 2011 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under the Bankruptcy Code with the United States Bankruptcy Court for the District of Minnesota.  The outstanding amount due on the Note as of the Petition Date was

3

$10,341,108, comprised of $10,236,629.73 in principal, plus unreimbursed costs and expenses of approximately $104,478.00.

On June 30, 2011, the Debtors filed the Motion and a budget for the proposed use of cash collateral (the "Budget"). On July 15, 2011, the Lender timely filed its Objection to Motion for Order Authorizing Use of Cash Collateral on a Final Basis. On July 19, 2011, the Debtors filed an Unsworn Declaration of Steven B. Hoyt in support of the Motion (the "Hoyt Declaration"). An amended budget (the "Amended Budget") was attached to the Hoyt Declaration. On July 20, 2011, this Court held a brief preliminary hearing on the Motion and on July 20, 2011 entered an Order Authorizing Use of Cash Collateral (the "Initial Cash Collateral Order"). During the preliminary hearing, the Court made no findings, but set an evidentiary hearing.

STATEMENT OF LAW

I.      **Adequate Protection is Required.**

Section 363(c) of the Bankruptcy Code provides that a debtor may only use cash collateral if each entity that has an interest in the cash collateral consents or the court, after notice and a hearing, authorizes such use in accordance with the provisions of section 363 of the Bankruptcy Code. 11 U.S.C. § 363(c)(2); *see also Freightliner Market Dev. Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362, 368 (9th Cir. 1987) (holding that "the purposes underlying § 363(c)(2) & (4) require that a debtor seek affirmative *express* consent from all parties involved before using cash collateral").

Section 363(e) provides that, at any time, on request of a party with an interest in the cash collateral, the court "shall prohibit or condition such use . . . *as is necessary to provide adequate protection of such interest.*" 11 U.S.C. § 363(e) (emphasis added). Because the Lender has not consented to the Debtors' use of cash collateral, the Lender's interests in the

4

cash collateral must be adequately protected, or the Debtors' request under section 363(c)(2) must be denied. 3 COLLIER ON BANKRUPTCY ¶ 363.03[4] (16th ed. 2009) (citing *In re Goode*, 235 B.R. 584 (Bankr. E.D. Tex. 1999) (debtor's need for funds could not substitute for adequate protection)). The Debtors have the burden of establishing that the Lender is adequately protected. 11 U.S.C. § 363(p).[1]

## II. The Debtors Cannot Provide Adequate Protection.

The Debtors do not even propose adequate protection as typically defined under section 361 of the Bankruptcy Code to be a cash payment or periodic cash payments or an additional or replacement lien to the extent that the use results in the decrease in the value of the creditor's interest in the property. 11 U.S.C. § 361. Rather, the Debtors resort to "such other relief as will result in the realization by the creditor of the indubitable equivalent of the creditor's interest in the property," or on these facts, a claimed equity cushion. To that end, the Eighth Circuit Court of Appeals looks to this Court to:

> (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

*In re Martin*, 761 F.2d 472, 476-77 (8th Cir. 1985).

Adequate protection is a question of fact for this Court. *Id.* at 474.

---

[1] Section 363(p) provides, "[i]n any hearing under this section—(1) the trustee has the burden of proof on the issue of adequate protection; and (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." 11 U.S.C. § 363(p); *see also In re Grant Broad. of Philadelphia, Inc.*, 75 B.R. 819, 822-23 (E.D. Pa. 1987). The parties have stipulated that the Lender has a valid, perfected security interest and therefore there is no dispute that the Lender has an interest in the Properties and the cash collateral.

The Motion seeks the use of the Lender's cash collateral without any meaningful provision of adequate protection. The Debtors argue that the Lender will be adequately protected by a continuing security interest in postpetition rents under section 552, alleged maintenance of the Properties (including the payment of some, but not all, postpetition expenses) and an alleged equity cushion. These assertions provide little protection to the Lender, and certainly not adequate protection as contemplated by Section 361. The Debtors have taken the simple position that even though they cannot pay costs to fund their operations, administrative costs or even real property taxes the Lender is nonetheless adequately protected. The Debtors are wrong.

A.      There is an Insufficient Equity Cushion.

In appropriate situations an equity cushion may be sufficient to protect the secured creditor's interest and to allow a debtor to use cash collateral. This is not one of those instances.

To constitute adequate protection, an equity cushion must be sufficiently large to protect a lender against an erosion of its collateral values. Although this analysis is done on a case by case basis, most courts have held that the equity cushion must be at least 20%. *Kost v. First Interstate Bank of Greybull*, 102 B.R. 829, 831-32 (D. Wyo. 1989) (collecting cases; equity cushion of 20% or more generally held adequate); *In re Johnson*, 90 B.R. 973, 980 (Bankr. D. Minn. 1988) (equity cushion of greater than 36% at the lowest valuation sufficient equity cushion); *In re Pitts*, 2 B.R. 476, 478 (Bankr. C.D. Cal. 1979) (holding a 15% cushion to be "minimal").

Single digit equity cushions do not provide adequate protection. *In re Dale*, 152 B.R. 573, 580 (Bankr. D. Minn. 1993) (equity cushion of 6% insufficient to provide adequate protection); *Baybank-Middlesex v. Ralar Distribs., Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995)

6

(4% cushion does not constitute adequate protection); *In re Jug End in the Berkshires, Inc.*, 46 B.R. 892, 899-900 (Bankr. D. Mass. 1985) (8.3% insufficient); *In re Le-May*, 18 B.R. 659, 660-61 (Bankr. D. Mass. 1982) (7% is inadequate).

A smaller equity cushion can be sufficient if combined with other forms of adequate protection, such as monthly payments. *In re McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding a 10% cushion sufficient as adequate protection where monthly payments were proposed to cover interest accruing on the claim).

Similarly, an equity cushion may not be sufficient if it is being eroded through the accrual of interest. *In re Johnson*, 90 B.R. at 980 ("Because of the nature of the equity cushion courts factor into their analysis the chance the cushion will erode. The sufficiency of the equity cushion then is a function of the size of the cushion and the rate at which it is being eroded."); *In re Jug End*, 46 B.R. at 899-900 (8.3% equity cushion "clearly unacceptable in the face of the continuous erosion of that cushion by daily interests"); *In re Schaller*, 27 B.R. 959, 961-62 (W.D. Wis. 1983) (17% to 18% cushion held not to offer adequate protection where cushion was being rapidly eroded by the daily accrual of interest on the debt); *In re Berge*, 33 B.R. 642, 650 (Bankr. W.D. Wis. 1983) (finding it necessary to determine the amount of accrued interest to determine whether a sufficient equity cushion exists); *see also In re Liona Corp., N.V.*, 68 B.R. 761, 767-68 (Bankr. E.D. Penn. 1987) (8.9% equity cushion that will diminish $120,000 per month inadequate). The Bankruptcy Appellate Panel of the Ninth Circuit, in interpreting sections 361 and 363, held that a secured creditor lacks adequate protection if there is a threat of decline in the value of the property. *In re Delaney-Morin*, 304 B.R. 365, 370 n.3 (B.A.P. 9th Cir. 2003). Indeed, even if a bankruptcy court determines that an equity cushion exists, "an otherwise sufficient

7

cushion may not adequately protect the creditor if the cushion is being eroded by accruing interest and/or depreciation." *In re Carson*, 34 B.R. 502, 506 (D. Kan. 1983).

The Debtors assert in the Motion that the Lender "has an equity cushion of approximately 38.5% in its collateral as of the Filing Date." Motion, ¶ 39. The basis for this assertion of an alleged equity cushion is the combination of (a) the unsubstantiated assertion that the Properties are worth $13,135,656, calculated using an undefined "stabilized rental income," (Motion, ¶ 37); and (b) additional collateral having an alleged value of $1,460,311.54 as of the Petition Date (Motion ¶ 38; Ex. C). The Debtors have acknowledged that the value of the alleged additional collateral was overstated by more than 40%. It is best worth $848,464.54.[2] Unfortunately, the values used by the Debtors to establish this alleged real property equity cushion are inflated even more than the 40% over valuation of the personal property.

        1.    The Debtors Overstate the Average Occupancy Rate
             and the Current Value of the Properties.

The Debtors assert, without any support or explanation that the Properties are worth $13,135,656. According to the Motion, this value is arrived at by taking the "stabilized rental income" of the Properties and applying a 9.5% capitalization rate. However, the Motion does not define what "stabilized rental income" is or why a 9.5% capitalization rate is appropriate. More importantly, it highlights the fatal flaw in the Debtors' analysis: rather than taking the value of the Properties that make up these estates, the Debtors create their own facts. Rather than use the actual rental income, the Debtors simply say the rental income has increased. It has not. Thus, even ignoring whether the capitalization rate was appropriate, the analysis is flawed from the outset.

---

[2] As discussed below, even this value is grossly exaggerated.

The flaws in the analysis begin with the Motion, which presents an inaccurate picture of the current state of the Properties. The Motion states that "the Properties currently have an average occupancy rate of approximately 80%." Motion, ¶¶ 12 and 37. The Debtors create the impression that their stated occupancy rate is accurate for all of the Properties and that the Properties are substantially occupied. That is not the case.

Mr. Hoyt testified in his deposition that he excluded the Cahill property and the Penn Corporate building (the building that was vacated the very day the Motion was filed) in determining the 80% occupancy rate. *See* Deposition Transcript of Steven Hoyt dated August 25, 2011 (hereinafter referred to as the "Hoyt Dep."), pg. 30, lines 16-23; pg. 46, lines 13-25; pg. 47, lines 1-4; pg. 62, lines 16-20. Copies of all pages from the Hoyt Dep. that are cited herein are attached as Exhibit A. Moreover, the occupancy rates set forth in the Motion were not even an accurate as of June 30, 2011, the date of the Motion. Instead, Mr. Hoyt used the average occupancy over the prior year. Hoyt Dep. pg. 30, lines 16-23. The occupancy rate of the Properties as of July 1, 2011, is set forth below and shows a very different picture:

| Property | Total Sq. Feet | Sq. Feet Vacant | Occupancy Rate |
|---|---|---|---|
| Bass Lake Road | 47,689 | 13,255 | 72.2% |
| Cahill Business Center | 60,082 | 37,843 | 37.0% |
| Larc Industrial Park III | 30,800 | 11,060 | 64.1% |
| Larc Industrial Park VII | 41,088 | 0 | 100% |
| Penn Corporate | 40,844 | 40,844 | 0% |
| University Center I and Center II | 50,617 | 11,020 | 78.2% |
| | 271,120 | 114,022 | Average: 57.9% |

Mr. Hoyt also testified that the "stabilized rental income" assumes 100% occupancy at all of the buildings, except for the Cahill Business Center, where Mr. Hoyt testified he used the "court ordered" sale price, without taking into account the waste claim asserted

9

against the Debtors, which likely reduces the value to the Lender and the estate from that property.  Hoyt Dep. pg. 84, lines 15-23; pg. 61, lines 20-25; pg. 62, lines 1-6.  The Debtors' flawed assumptions are critical for several reasons.  First, using an assumption of full occupancy when the Properties are only 58% occupied simply does not reflect the current value of the Properties, rather it reflects something akin to what the Debtors hope the Properties would be worth if they were "stabilized" at 100% occupancy.  Second, the Debtors' Amended Budget does not include any costs that would enable the Debtors to obtain full occupancy.  For example, neither the Budget attached to the Motion nor the Amended Budget attached to the Hoyt Declaration included amounts for tenant improvements or lease commissions despite the fact that the Debtors have stated that tenant improvements are necessary if they are to lease the Penn Corporate building.  Motion, pg. 3 fn. 1.[3]  The Debtors' use of the "stabilized market value" fiction completely fails to establish values for adequate protection.[4]

The Lender retained CB Richard Ellis, Inc. to appraise the Properties.  CB Richard Ellis concluded that the "as is" values of the Properties are as follows:

| Property | Value | Date of Appraisal |
|---|---|---|
| Bass Lake Road | $1,300,000 | September 7, 2011 |
| Cahill Business Center | $2,200,000 | September 7, 2011 |
| Penn Corporate | $1,750,000 | September 7, 2011 |
| Larc Industrial Park III | $1,100,000 | January 12, 2011 |
| Larc Industrial Park VII | $1,450,000 | January 12, 2011 |
| University Center I & II | $2,750,000 | January 12, 2011 |
| **Total** | $10,550,000 | |

---

[3]  The Amended Budget, unlike the Budget, has line items for tenant improvements and lease commissions but there are no amounts included in those line items.  The Debtors have no ability to fund them.

[4]  The Debtors may have more leeway for attempted projections of value in connection with the feasibility of a plan, but not to shift the risks to get there to the Lender in the interim.

These values reflect the current value of the Properties, not the hoped for value of the Properties should they ever be "stabilized" at 100% occupancy.[5] The appraisals do show that in the future, should the Properties be more fully leased, they may be worth the Debtors' hoped for values. But this just highlights the fact that the Debtors' values in the Motion do not reflect the current value, rather they may reflect for a hoped for future value of the Properties. The only good news for the Lender in these cases is, assuming the CB Richard Ellis appraisals are not overstated; the Lender has a slender cushion of less than 3% to recover its claim. On a real property value of approximately $10.4 million, the Lender has approximately $300,000 (less postpetition negative accruals and costs) to carry it through these cases.

    2.   <u>The Additional Collateral Value is Highly Speculative and Overstated.</u>

The additional collateral offered by the Debtors in the Motion consists primarily of an aged speculative default judgment against a third party, cash on hand, and accounts receivable. The value attributed to this collateral is $848,464.54, of which $717,152.62 represents the uncollected default judgment and the remainder is cash that the Debtors propose to use during these cases. The Debtors have taken no steps to collect the default judgment for over a year and do not know whether it is collectible. Mr. Hoyt testified that the Debtors were still investigating whether it was collectible and that any collection of this default judgment would be pursued on a contingency basis. Hoyt Dep. pg. 110, lines 12-25; pg. 111, lines 1-8. As a result, even assuming the default judgment were fully collectible, the value is overstated by at least 25%. Unfortunately, any recover is completely speculative. Hoyt Dep. pg. 111, lines 9-21. Further, aside from the funds in the Crown

---

[5] The Lender obtained updated appraisals for those properties that had experienced changes in occupancy since the January 2011 appraisals.

Bank account, the Debtors propose to spend all other cash collateral. As a result, neither the default judgment nor the collateral outside of the Crown Bank account should have any value for adequate protection. As a result, the only collateral being provided to the Lender (assuming the Debtors do not spend it on their unfunded operations) is the cash on hand, which the Lender already has a security interest in. Further, the cash on hand, which had a value as of the Petition Date of $89,231, will likely decrease over the period covered by the Amended Budget.[6]

Based on the appraised value of the Properties and the real values of the other collateral that may be available to the Lender, the Lender's equity cushion is not even close to the 38.5% proffered by the Debtors. It is at best 3%. ***A 3% equity cushion is insufficient provide adequate protection to the Lender.*** A chart setting forth the calculation of the maximum equity cushion showing appraised values and the Debtors' alleged values is set forth below:

| Collateral | Appraised Values | Debtors' Alleged Values |
|---|---|---|
| Properties | $10,550,000 | $13,135,656 |
| Cash collateral | $89,123 | $848,465 |
| **Total** | $10,639,123 | $13,984,121 |
| **Prepetition Debt** | ($10,341,108) | ($10,341,108) |
| **Equity Cushion** | $298,015 | $3,643,013 |
| **Percentage Cushion** | 2.9% | 35.2% |

**B.     The Equity Cushion is Eroding.**

The Motion does not acknowledge the erosion of any hoped for equity cushion caused by the accrual of interest, costs and expenses of the Lender after the Petition Date.

---

[6] The Amended Budget does not include a line item for contingency expenses. The Lender has already approved the use of approximately $9,500 to fix a flooring issue in one of the occupied spaces. There are no funds in the Amended Budget for such repairs.

Because the Lender is oversecured, it is entitled to recover postpetition interest and costs and expenses on its claim pursuant to section 506(b) of the Bankruptcy Code. Postpetition interest should be calculated at the default rate as set forth in the contract between the parties. 4 COLLIERS ON BANKRUPTCY ¶ 506.04[2][b][i] (16th ed. 2009) ("The great majority of courts to have considered the issue . . . have concluded that postpetition interest should be computed at the rate provided in the agreement . . . the so-called 'contract rate' of interest."); *Milham v. Key Bank Nat'l Assoc.*, 141 F.3d 420, 423 (2d Cir. 1998) (awarding default interest as provided in the contract); *In re Vest Assocs.*, 217 B.R. 696, 702 (Bankr. S.D.N.Y. 1998); *In re P.G. Realty Co.*, 220 B.R. 773, 780 (Bankr. E.D.N.Y. 1998) ("The Court should be loathe to exercise [its equitable powers] in the absence of compelling evidence that recognition of a right created by state statute or private agreement would do violence to the principles which constitute the foundation of bankruptcy law.").

The current interest rate under the Note is 5.04%. Accordingly, each month approximately $42,993.84 in interest accrues under the Note. The default rate of interest is an additional 5%. Accordingly, each month approximately $42,652.62 in default interest accrues under the Note, for a total interest accrual of approximately $85,646.46 per month.[7] Additionally, the Lender is entitled to reimbursement of all late fees, costs and charges, including attorneys' fees. As of September 1, 2011 the approximate amount of these types of costs and expenses that has accrued is approximately $125,687.44. Accordingly, to date, the Lender is owed an additional $262,744.81 in interest for July – September, for a total postpetition increase in debt of $388,432.25, which amount increases every month at a rate of no less than $85,646.46. At that rate, without even taking into account any additional costs and expenses that the Lender is entitled to under the loan documents, the debt under

---

[7] These numbers are calculated based on a 30-day month.

the Note will increase by at least $750,000 by the end of December 31, 2011, the date the Amended Budget runs through.  That amount exceeds the current equity cushion.

### C.   The Debtors' Adequate Protection Proposal Does Not Provide the Lender With the Indubitable Equivalence.

The Eighth Circuit requires this Court to determine three things in order to determine whether adequate protection has been provided.  *In re Martin*, 761 F.2d at 476-77.  First, this Court must establish the value of the collateral.  As set forth above, for purposes of determining adequate protection, the value of the Properties and the cash collateral as determined by the Lender is the only value based on third party appraisals and the undisputed facts.  Accordingly, this Court should determine that the value is no more than $10,681,312.

Second, the Eighth Circuit asks this Court to identify the risks to the Lender's collateral from the use of cash collateral.  *Id.*  Here, the risks are substantial.  Not only do the Debtors propose not to pay the real property taxes in full when they come due on October 15, 2011, the Amended Budget does not reserve sufficient funds for the property taxes going forward.  As a result, the unpaid property taxes will create a lien on the Properties superior to the liens of the Lender.

The Amended Budget also has no budgeted amounts for leasing commissions, tenant improvements, or cash needed to maintain and improve the Properties.  Further, as testified by Mr. Hoyt at his deposition, there is no anticipated improvement in the occupancy rate during the term of the Amended Budget, a fact that can easily be deduced from the Amended Budget itself.  Hoyt Dep. pg. 67, lines 17-25.  That means that not only will no additional tenants will be added, but it is possible that additional vacancies could occur.  As a result, the rents, which are finite, will be expended to the detriment of the Lender.  Further, the

14

value to be recovered from the Cahill Building will continue to deteriorate as additional credits are incurred in favor of the purchaser and the risk of a waste claim is increased.

Finally, the Eighth Circuit asks this Court to determine "whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence." *In re Martin*, 761 F.2d at 476-77.

While sections 361(1) and (2) by their own terms compensate for a decrease in value, the "compensatory nature of adequate protection is even more apparent from the catch-all alternative of section 361(3)." *In re American Mariner Indus.*, 734 F.2d 426, 432 (9th Cir. 1984). "'Indubitable' means 'too evident to be doubted.'" *In re Arnold & Baker Farms*, 85 F.3d 1415, 1421 (9th Cir. 1996) (quoting *In re Arnold & Baker Farms*, 177 B.R. 648, 661-62 (9th Cir. BAP 1994)). "[T]o the extent a debtor seeks to alter the collateral securing a creditor's loan, providing the 'indubitable equivalent' requires that the substitute collateral not increase the creditor's risk exposure." *In re Keller*, 157 B.R. 680, 683-84 (Bankr. E.D. Wash. 1993). The use of indubitable equivalent "at least encourages if not requires a present value analysis under section 361," so that the present value of the secured creditor's interest is protected. *American Mariner*, 734 F.2d at 432; *see also In re Martin*, 761 F.2d at 477 ("Indubitable equivalence requires 'such relief as will result in the realization of value.'") (quoting *In re Sheehan*, 38 B.R. 859, 864 (D.S.D. 1984)).

The Debtors do not provide the Lender with the indubitable equivalent. Rather, the most likely outcome under this scenario is that: (a) the cases will be administratively insolvent; (b) the real property tax liens will accrue ahead of the Lender's liens; (c) the Properties will continue to suffer high vacancy rates; (d) the Debtors will have no cash to effect tenant improvements, pay lease commissions or adequately maintain the Properties;

15

and (e) the Lender's secured claim will increase by over $750,000. That is not the indubitable equivalent.

## CONCLUSION

It is well settled law that a debtor may only use cash collateral without the consent of the secured party if adequate protection has been provided. As set forth above, the Debtors do not come close to providing the Lender with adequate protection. Rather, the Debtors' proposal shifts the entire risk to the Lender in contravention of the requirements of the Bankruptcy Code. This Court cannot allow any further use of the Lender's cash collateral for any reason.

For the foregoing reasons, the Lender respectfully requests that this Court deny the Motion and enter an order prohibiting all further use of cash collateral without the Lender's express written consent.

Dated: September 12, 2011

**WINTHROP & WEINSTINE, P.A.**

Christopher A. Camardello, # 0284798
225 South Sixth Street
Suite 3500
Minneapolis, MN 55402-4629
(612) 604-6400

**PERKINS COIE, LLP**

/s/ Jeanette L. Thomas
Jeanette L. Thomas, *admitted pro hac vice*
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
(503) 727-2000

Attorneys for Wells Fargo Bank N.A., as trustee for
the registered holders of J.P. Morgan Chase
Commercial Mortgage Securities Corp., Commercial
Mortgage Pass-Through Certificates, Series 2004-
LN2, by and through CWCapital Asset Management
LLC, as Servicer

60642-0340/LEGAL21673080.3

**EXHIBIT A**

1  budget?

2      **A.    I think it was the desired format for**

3  **the hearing before Judge Kressell (sic).**

4      Q.    So I'm going to ask you some questions

5  about the motion itself.  You said that you reviewed

6  the motion.

7      **A.    I did.**

8      Q.    And the motion talks about occupancy

9  rates of these properties.  I'm going to try to find

10 the paragraph.  It is at least on page 10, paragraph

11 37, but I think it comes up before that.  Just go with

12 that one.  The motion states that the pool D properties

13 have an average occupancy rate of approximately 80

14 percent.

15     **A.    Yes.**

16     Q.    Who determined that occupancy rate?

17     **A.    I did.**

18     Q.    And can you tell me how you did that.

19     **A.    Well, we looked at the average occupancy**

20 **of the properties during the preceding year and**

21 **disregarded the Cahill property, because that is under**

22 **order to be sold to a gentleman named Jim Mulcahy so**

23 **the occupancy is irrelevant.**

24     Q.    Do you know whether or not you noted in

25 the motion that you disregarded that building?

 1   maintenance?

 2              MS. DUKE:  Objection.  Vague.

 3              THE WITNESS:  We've received no

 4   complaints from anybody.

 5   BY MS. THOMAS:

 6        Q.   Okay.  So if we look at the next one,

 7   Penn Corporate --

 8        **A.   Yes.**

 9        Q.   -- this one also shows no vacancy on the

10   back.  But this is the property that was just recently

11   vacated, correct?

12        **A.   Yes.  On June 30th.**

13        Q.   So when you calculated -- I'll wait.  So

14   when you calculated the average 80 percent occupancy

15   rate, did you count this building as being fully

16   occupied?

17        **A.   Well, this building has been occupied**

18   **for 18 years so -- fully occupied.  If you looked at it**

19   **18 years, 17, 16, 10, 5-year snapshot, you would show**

20   **100 percent occupancy of the property.  For purposes of**

21   **calculating the 80 percent, I did not include this**

22   **because it just recently became available and we**

23   **believe it will be either -- we believe it will be**

24   **re-tenanted in short order.**

25        Q.   When you say that you didn't count it,

Exhibit A
Page 2 of 9

1   did you count it as vacant or just didn't include it at

2   all?

3          A.   I didn't include it.  I thought it was a

4   special situation.

5          Q.   Are you discussing leases with any

6   parties on this building?

7          A.   Yes, we are.

8          Q.   How many parties?

9          A.   Two.

10         Q.   Are those parallel discussions, or are

11  they two parties who want to split the building?

12         A.   No.  They both would like the entire

13  building.

14         Q.   What stage are you at, say, with Party

15  A?

16         A.   I'd say pretty close.  I think we're --

17  we have a few deal points, but I have a meeting next

18  week with the principals of the company to attempt to

19  iron out those deal points.

20         Q.   Do you have a letter of intent from

21  them?

22         A.   We do not have an executed letter of

23  intent.

24         Q.   Or a term sheet?

25         A.   We have exchanged various proposals on

Page 61

1   lender.

2              Q.    If there isn't an agreement, there

3   wouldn't be a basis for charging a commission?

4              A.    **I think we've taken a few steps backward**

5   **since Thursday with the lender.  I don't even think**

6   **that -- I don't even think it is relevant given the**

7   **current position of the lender.  You can't have a sales**

8   **commission if you can't have a sale.**

9              Q.    So that takes care of University Center.

10             So Penn, you have a separate buyer.  So

11  you have a buyer for Cahill.  Then you have one buyer

12  for Bass Lake, both Larc Parks and University Center,

13  and then Penn?

14             **A.    Yes.**

15             Q.    The purchase price on Penn, you thought,

16  was -- well, your hoped for purchase price is roughly

17  two and a quarter million dollars?

18             **A.    Two million two fifty, I think is about**

19  **where it will settle.**

20             Q.    And can you tell me what is the purchase

21  price for Cahill?

22             **A.    It goes down every day.  Right now -- my**

23  **calculation a little bit ago was three million three**

24  **eighty-six.**

25             Q.    So roughly 3.4.  Does that take into

1   account -- they've made a waste claim, haven't they?

2          A.   Yes.

3          Q.   That doesn't take into account any waste

4   claim?

5          A.   No.  We need to get that determined by

6   the court.

7          Q.   And are you currently pursuing

8   resolution of that?

9          A.   We would like to.  We're not able to

10  right now.

11         Q.   Why are you not able to?

12         A.   Because the lender has objected to our

13  use of cash collateral to pay legal fees to get that

14  issue resolved.  I can't get it resolved without a

15  lawyer.

16         Q.   So just to sort of recap my

17  understanding of this occupancy rate issue, when you

18  calculated the occupancy rate, you excluded both Cahill

19  and Penn?

20         A.   Yes.

21         Q.   But on the Larc Industrial Park VII, you

22  treated it as fully occupied even though the single

23  tenant's lease expires soon.

24         A.   It is up for renewal.  They've been

25  there a long time.

1        Q.   Are you marketing them -- are any of

2  them being marketed with other properties that Hoyt

3  Properties either manages or which you personally have

4  an interest in?

5        **A.   We have other properties for sale, but**

6  **they are not a part of any other group.**

7        Q.   But I could come up, I could pick one of

8  these properties and one of the other properties and

9  say I want to buy the both of them, but you are not

10  trying to sell them that way?  You are just saying I

11  have all of these properties for sale?

12        **A.   No.  For example, we have five**

13  **properties in Chicago that are for sale.  So it is**

14  **possible that somebody could want to buy some of these**

15  **properties plus the Chicago properties.  Not likely**

16  **but --**

17        Q.   So going back to the budget -- when I

18  talk about the budget now, I think we'll stick with the

19  undated one in the unsworn declaration.

20        **A.   Okay.**

21        Q.   This budget doesn't contemplate or take

22  into account any sales of the buildings?

23        **A.   No, it does not.**

24        Q.   Does it contemplate any new leases?

25        **A.   No, it does not.**

1          A.    The income approach would take the

2     stabilized occupancy of a property.  So if a property

3     is a hundred percent leased, that is the income.  If a

4     property is less than a hundred percent leased, an

5     appraiser would typically make an assumption that the

6     remainder of the space would lease up at the same

7     rental rates as the other tenants are paying in the

8     building, take that number up to full occupancy, then

9     apply a capitalization rate to it.

10          Q.    So on a building that was only 60

11     percent occupied, would you take the average rental

12     rate for the other square footage and apply it to

13     that?

14          A.    Yes.

15          Q.    So if we look at Exhibit A in the

16     motion -- my other version is highlighted.  It is much

17     easier to find it in the highlighted version.

18              So on page 10 of Exhibit A, what we

19     marked as Exhibit A, the stabilized rental income of

20     the pool D property, so you assumed that each of these

21     properties was fully rented.  Is that true for Cahill?

22          A.    Cahill, I used $3.4 million, because

23     that's approximately the court ordered sale price.

24          Q.    Right.  So for Bass Lake Road, you

25     assumed that, instead of having 15,000 square feet of

Steven Hoyt - 8/25/2011
In re: Fenton Sub Parcel D, LLC, et al.

Page 110

1    it?

2          A.    Yes.  We have retained a lawyer or

3    lawyers to go after the company and collect it.

4          Q.    When did you retain that lawyer?

5          A.    I think about a year ago.

6          Q.    What action has been taken to collect

7    that judgment?

8          A.    We are -- we have the judgment.  We have

9    communicated with our -- our lawyers communicated with

10   their lawyer.  Our lawyer is doing a background check

11   and determining the collectability of the amount and is

12   formulating a plan for post-judgment discovery.

13         Q.    So do you know whether Charles White,

14   Inc., is still in business?

15         A.    They are.

16         Q.    Have you received the report from your

17   law firm about the collectability?

18         A.    I have not.

19         Q.    So you don't know?  You don't currently

20   know whether that judgment is fully collectible or

21   not?

22         A.    I don't know.

23         Q.    Can you tell me, the arrangement for

24   collecting that judgment, is it a contingent fee

25   arrangement?

Page 111

1       A.   It is.

2       Q.   So if they could collect it, does this

3  represent the portion that would come to the estate, or

4  is this the full amount of judgment?

5       A.   **That's the full amount of judgment.**

6       Q.   Do you have any idea what the

7  contingency fee would be?

8       A.   **25 percent.**

9       Q.   So this amount is overstated by 25

10 percent?

11      A.   **Yes, it is.**

12      Q.   Are you carrying this judgment on your

13 books?

14      A.   **We --**

15      Q.   As an asset?

16      A.   **No, we're not.**

17      Q.   You've written it off?

18      A.   **We have reserved for it.**

19      Q.   So you don't have any idea when you

20 might recover, when any recovery might be made?

21      A.   **I don't.**

22      Q.   That's all speculative.

23           So there's also a line item here for

24 general accounts receivable of roughly $12,000.

25      A.   **Yes.**

## PROOF OF SERVICE

There are currently no non-ECF Participants who require service of the **Trial Memorandum and Chronology of Facts and Statement of Law of Wells Fargo Bank N.A., as Trustee for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2004-LN2, by and Through CWCapital Asset Management LLC, as Special Servicer** ("Chronology") by U.S. Mail.

All ECF Participants registered with the Court to receive electronic notice as of the date below received an e-filed copy of this Chronology:

Cynthia A. Moyer
James L. Baillie
Sarah M. Gibbs
Fredrikson & Byron, PA
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
*Counsel for Debtor*

US Trustee
ustpregion12.mn.ecf@usdoj.gov

Sarah J Wencil
US Trustee Office
Suite 1015 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Michael L. Meyer, Esq.
Ravich Meyer Kirkman McGrath
Nauman & Tansey, P.A.
4545 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
*Counsel for Steven B. Hoyt*

Timothy M. Kelley
timothy.kelley@leonard.com
On behalf of Interested Party Timothy Mulcahy

Amanda K Schlitz
amanda.schlitz@leonard.com, ma.xiong@leonard.com
On behalf of Interested Party Timothy Mulcahy

Joseph W. Lawver
jlawver@messerlikramer.com, kmilner@messerlikramer.com
On behalf of Interested Party Messerli & Kramer

Brian F Leonard
bleonard@losgs.com, swood@losgs.com
On behalf of Interested Party Commerce Bank

DATED this 12th day of September, 2011

PERKINS COIE LLP

/s/ Jeanette L. Thomas
Jeanette L. Thomas, *Admitted Pro Hac Vice*